723 So.2d 1076 (1998)
Frank O. SADLER and Janice L. Sadler
v.
Kai D. MIDBOE, et al.
No. 97 CA 2120.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
*1077 John David Ziober, Baton Rouge, for Plaintiffs-Appellants Frank O. Sadler and Janice L. Sadler.
Michael P. Smith, Baton Rouge, for State of Louisiana.
Before: FOGG, PARRO, FITZSIMMONS, GUIDRY, JJ., and CHIASSON,[1] J. Pro Tem.
REMY CHIASSON, Judge Pro Tem.
Plaintiffs, Frank and Janice Sadler, appeal from a judgment of the trial court, granting a peremptory exception pleading the objection of prescription urged by the Louisiana Department of Environmental Quality (LDEQ)

FACTS AND PROCEDURAL HISTORY
Cracker Barrel Stores, Inc. (CBSI) operated Cracker Barrel No. 27, a convenience store which also sells gasoline. This store is located in New Roads, Louisiana on the corner of Louisiana Highway 1 and Louisiana Highway 78, directly across from a residence *1078 owned by Frank and Janice Sadler, located on Hwy. 1. Frank Sadler is also the president, a director, and the owner of 50% of the common stock in CBSI.
In December of 1988, a leak occurred in the product delivery lines leading to the underground storage tanks at the store. The leak was discovered by Frank Sadler in January of 1989. The leak migrated under La. Hwy. 1 to the Sadlers' residence located on False River. The release was confirmed by LDEQ on February 8, 1989.
The LDEQ administers the Motor Fuels Underground Storage Tank Trust Fund (the "Tank Trust Fund") which allows the reimbursement from the Tank Trust Fund to eligible underground storage tank owners of costs incurred in the cleanup of groundwater and subsurface soils caused by the leakage from these tanks.
CBSI hired Westinghouse Environmental and Geotechnical Services (Westinghouse) from an emergency response contractor list provided by the LDEQ to perform remediation of the underground leak. On or about February 22, 1989, the product lines which had caused the release were completely replaced. Thereafter, Westinghouse used the Sadlers' property to perform remediation pursuant to a plan of remediation submitted by CBSI and Westinghouse to the LDEQ, who approved the plan. The use of the property included the installation of a treatment system and the placement of equipment on the property.
On July 10, 1991, the LDEQ received a request from Westinghouse to discontinue remediation activities. In response to this request, in a letter directed to Frank Sadler, the LDEQ advised CBSI of the need for further sampling and the possibility of other corrective action before remediation activities could be discontinued. No further remediation was performed and the equipment was removed in December of 1991.
Pursuant to the provisions of the Tank Trust Fund, CBSI submitted three reimbursement applications to the LDEQ for cleanup costs incurred by Westinghouse. The first two payments from the Tank Trust Fund were made on March 22, 1990, in the amount of $98,748.00 and on February 14, 1991, in the amount of $39,405.05. The third reimbursement application of CBSI, submitted on April 6, 1992, requested a total of $150,123.00. Included in the amount requested was an invoice dated January 10, 1992, from the Sadlers to Westinghouse for use of the Sadler residence for remediation purposes from early 1989 through December, 1991. The amount requested was $64,680.00.
In a letter dated September 28, 1992, the LDEQ remitted a payment to CBSI in the amount of $82,897.75. The enclosed report explained that "$67,251.66 was not allowed because of missing support data, excessive costs, items claimed in duplicate, and property rental and freight charges are not reimbursable."
On September 23, 1993, Frank and Janice Sadler filed a petition for damages against CBSI and Kai Midboe, Secretary of the LDEQ, as the representative of the Tank Trust Fund domiciled in the Parish of East Baton Rouge. The Sadlers alleged that their residence had been damaged as a result of the leakage of gasoline from the underground motor fuel storage tanks. The Sadlers requested a reasonable fee for equipment storage on their property and for the time the residence was unmarketable due to the remediation activities undertaken and the use of the property for placement of the cleanup equipment. The Sadlers also claimed a loss of value of the property as a result of the contamination of the soil, interest paid by them on the property's mortgage since the cancellation of a $210,000.00 purchase agreement on the property after the discovery of the leak; and any other loss or damage which may become apparent prior to trial of this matter.
Thereafter, LDEQ filed an answer to the petition. This answer was subsequently amended.
CBSI also attempted to answer the petition, contending that at all times, it was in substantial compliance with, and an eligible participant in, the Tank Trust Fund. Thus, the Tank Trust Fund was obligated to indemnify CBSI for any and all claims by any and all third parties, including the Sadlers. *1079 The answer was signed by Janice Chiasson, Secretary-Treasurer of CBSI. The record reflects that Ms. Chiasson is not an attorney. We note here that a corporation, as a fictional legal person, can only be represented by licensed counsel. Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034, 1059 (La.1987).
On December 29, 1994, the Sadlers filed a motion for partial summary judgment, alleging that they were entitled to a judgment on the face of the pleadings against the LDEQ, declaring it liable, jointly, severally and in solido with CBSI and declaring that the LDEQ must indemnify CBSI for all losses sustained by the Sadlers. This motion was denied by the trial court on February 17, 1995.
On January 30, 1995, the LDEQ filed a second supplemental and amending answer.
On February 10, 1995, the LDEQ filed a peremptory exception pleading the objections of prescription and no cause of action. The LDEQ alleged that the Sadlers' petition, on its face, alleged that the cause of action occurred more than one year prior to the commencement of this action and was prescribed by the prescription of one year. The LDEQ further alleged that the Sadlers had failed to state a cause of action for the rental charges.
On April 20, 1995, the Sadlers filed a renewed motion for partial summary judgment based on the trial court's reasons for denying their first motion. Attached to the memorandum in support of their motion for partial summary judgment was an unexecuted copy of a document entitled "Consent Judgment As To Liability Only," which purported to grant partial summary judgment in favor of the Sadlers, finding CBSI liable for any and all damages.
The Sadlers also filed a memorandum in opposition to the exceptions filed by the LDEQ and attached to the memorandum was a "Renunciation of Prescription and Continuing Acknowledgment of Liability," which was executed by CBSI on September 20, 1993.
The LDEQ again amended their answer to allege that CBSI was nothing more than a thinly veiled and undercapitalized corporate entity, representing nothing more than the alter ego of Frank Sadler.
After a hearing was held on September 8, 1995, the trial court issued a judgment on March 14, 1996, granting the LDEQ's exception of prescription.
On March 22, 1996, the Sadlers filed a motion for new trial. The trial court subsequently vacated its previous judgment and granted a new trial on April 24, 1996.
On March 27, 1997, the trial court denied the LDEQ's peremptory exception of prescription.
On May 9, 1997, the LDEQ filed a motion to reconsider judgment on the peremptory exception of prescription. The trial court subsequently vacated its judgment of March 27, 1997, and on June 17, 1997, the trial court granted the LDEQ's peremptory exception of prescription.
The Sadlers have appealed from this judgment, alleging the following assignments of error for our review: [2]
1. The trial court erred in allowing the LDEQ standing to raise the exception of prescription when its eligible participant had admitted its liability.
2. The trial court committed error by not addressing the issue of unjust enrichment/quasi-contract, which claim has a prescriptive period of 10 years.
3. The trial court erred in failing to find that the Appellants' claims are quasi-contractual in nature, and as such, can prescribe only after ten (10) years.
4. The trial court erred in determining that continuing remediation efforts and payment for clean up activities do not represent tacit acknowledgment, interrupting prescription continuously through September 30, 1992.

*1080 5. The trial court erred in determining that the prescriptive period commenced prior to November, 1992, when the Appellants first discovered that their property was not marketable and had not been cleaned up.

THE TANK TRUST FUND
Monies deposited in the Tank Trust Fund are used to defray the cost to the state of administering the underground storage tank program and the cost of investigation, testing, containment, control, and cleanup of releases from underground storage tanks containing regulated substances. La. R.S. 30:2195 C. The revenues collected from the fees established in La. R.S. 30:2195.3 A(1)(a) and (B) are deposited into the fund. La. R.S. 30:2195 B.
At the time this incident occurred, La. R.S. 30:2195.2 provided, in pertinent part, as follows:
B. Whenever in the secretary's determination incidence of groundwater or subsurface soils contamination resulting from the storage of motor fuels may pose a threat to the environment or the public health, safety, and welfare and the owner of the underground storage tank has been found to be in substantial compliance with the rules and regulations of the department, the department shall obligate monies available in the trust to provide for the following response actions:
(1) Investigation and assessment of sites shown to be contaminated by a release into the groundwater or subsurface soils from an underground motor fuels storage tank;
(2) Interim replacement and permanent restoration of potable water supply where it has been demonstrated that the supply was contaminated by a leak from an underground motor fuels storage tank;
* * * * * *
F. The trust may be used to make payments to a third party who brings a third party claim against any owner of an underground motor fuel storage tank because of damages sustained by a release into the groundwater or subsurface soils and who obtains a final judgment in said action enforceable in this state against the owner if and only if it has been satisfactorily demonstrated that the owner was in substantial compliance with the laws, rules and regulations at the time that the release occurred as defined in R.S. 30:2194(B)(5). The indemnification limit of the trust with respect to satisfaction of third party claims shall be that which is necessary to satisfy underground storage tank owner financial responsibility requirements of Subtitle I of the Resource Conservation and Recovery Act, U.S.Code.[3]
A "third party claim" means any civil action brought or asserted by any person against any owner of any underground storage tank for damages to person or property when damages are the direct result of the contamination of groundwater and/or subsurface soils by motor fuels released during operation of storage tanks covered under this chapter. La.R.S. 30:2194 B(6).
La. R.S. 30:2195.4 at the time of the incident provided for the procedures for disbursements from the Tank Trust Fund, in pertinent part, as follows:
B. Payments shall be made to third parties who bring suit against the secretary in his official capacity as representative of the trust and the owner of an underground motor fuel storage tank who is in substantial compliance as stated in *1081 R.S. 30:2194 and such third party obtains a final judgment in that action enforceable in this state. The owner above stated shall pay the amount required by R.S. 30:2195.9 toward the satisfaction of said judgment and after that payment has been made, the trust will pay the remainder of said judgment. The attorney general of the state of Louisiana is hereby responsible to appear in said suit for and in behalf of the secretary as representative of the trust and the secretary as representative of the trust is a necessary party in any suit that is brought by any third party which would allow that third party to collect from this trust; and the secretary must be made a party to the initial proceedings. Payment shall be made to the third party claimant if and only if the judgment is against an owner who was in substantial compliance on of the date the incident which gave rise to the claim occurred.

UNJUST ENRICHMENT
The Sadlers contend that their claim for rentals for the use of their residence is an action for unjust enrichment/quasi-contract, which has a prescriptive period of ten years. The Sadlers allege that the use of their residence was required by Westinghouse to remediate the leak and was directly associated with and was integral to the entire remediation effort. As a result, the Sadlers allege that they were unable to use their property and are entitled to a reasonable fee for the use of their property by Westinghouse and LDEQ has refused to remit the rentals claimed by them.
The five requirements necessary to state a cause of action for unjust enrichment (actio de in rem verso) are (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other remedy at law available to plaintiff. Creely v. Leisure Living, Inc., 437 So.2d 816, 821-822 (La.1983).
Unjust enrichment principles are only applicable to fill a gap in the law where no express remedy is provided. Mouton v. State, 525 So.2d 1136, 1142 (La.App. 1st Cir.), writ denied, 526 So.2d 1112 (La.1988).
We initially note that the Sadlers did not set forth allegations in their petition which would support a cause of action for unjust enrichment. In brief, the Sadlers imply that, as a lessor, they are entitled to recover rent for the lessee's possession of the premises under the doctrine of unjust enrichment. However, the Sadlers acknowledge that they had no lease with either Westinghouse or LDEQ for the property, therefore, there can be no contractual claim because there was no contract. Additionally, a "third party claim" allowed under the statute in question is clearly delictual in nature. Thus, the Sadlers are precluded from having an equitable remedy for unjust enrichment.

PRESCRIPTION
The Sadlers first argue that the LDEQ has no standing to raise the peremptory exception pleading the objection of prescription. In brief, the Sadlers cite no authority in support of this argument. The Sadlers claim that liability is "automatic" under the Tank Trust Fund if it is established that (1) CBSI was an eligible participant as of the date the leak occurred and (2) CBSI is liable to the Sadlers. Thus, the LDEQ is precluded from raising prescription as a defense to its liability under the Tank Trust Fund. The Sadlers then point to the fact that CBSI renounced prescription in its favor.
As noted earlier, the secretary of the LDEQ, as representative of the Tank Trust Fund, is a necessary party in any suit that is brought by any third party which would allow that party to collect from the trust and therefore, must be made a party to the initial proceedings. La. R.S. 30:2195.4 B(1). Prescription is a defense that must be raised and is effective in favor only of the party claiming it. It cannot be urged by one party defendant in favor of another, and the failure of one party defendant to claim it does not deprive another party defendant of the claim. Cochren v. Louisiana Power & Light Co., 94-0002, p. 5 (La.App. 4th Cir.6/15/94); 639 So.2d 342, 345, writ denied, 94-1899 (La.10/28/94); 644 So.2d 654. This argument is without merit.
*1082 Next, the Sadlers contend that their claims are quasi-contractual in nature and thus, can only prescribe after ten years.
The burden of proof generally rests upon the party pleading prescription as an affirmative defense. Where, however, plaintiff's petition shows on its face that the asserted claim has prescribed, plaintiff bears the burden of proving interruption or suspension of prescription sufficient to bring the action within the prescriptive period. Abrams v. Herbert, 590 So.2d 1291, 1295 (La.App. 1st Cir.1991). Whether a pleading has prescribed on its face must be determined, in part, according to the date plaintiff alleged knowledge of the tortious act, the damage, and the causal relation between the wrongful act and the damage. Abrams v. Herbert, 590 So.2d at 1295. The burden of proof does not shift to plaintiff unless the face of her petition reveals that she had knowledge of the damage and its cause at a time beyond the prescription period. Abrams v. Herbert, 590 So.2d at 1295. The proper prescriptive period to be applied in any action depends upon the nature of the cause of action. It is the nature of the duty breached that should determine whether the action is in tort or in contract. Roger v. Dufrene, 613 So.2d 947, 948 (La.1993).
In their petition, the Sadlers seek reimbursement from the Tank Trust Fund for losses incurred as a result of the contamination caused by the leak in the storage lines. These allegations constitute a third party claim for damages which are the direct result of the contamination of groundwater and/or subsurface soils by motor fuels released during operation of storage tanks. See La. R.S. 30:2194 B(6). This cause of action is a delictual action and subject to the one year liberative prescriptive period set forth in La. C.C. art. 3492.
Additionally, La. C.C. art. 3493 provides that "[w]hen damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage."
In South Central Bell Telephone Company v. Texaco, Inc., 418 So.2d 531, 533 (La. 1982), the Louisiana Supreme Court was presented with facts similar to the case before us. South Central Bell telephone cables were damaged and eventually replaced because of a gasoline leak from the tanks of a service station. In discussing the continuing tort concept, the court stated that "[w]hen the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated.... Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from cessation of the wrongful conduct causing the damage." South Central Bell Telephone Company v. Texaco, Inc., 418 So.2d at 533. The court determined that the prescription on the cause of action began to run in December of 1975, the date the tanks were replaced.
In the case before us, the trial court determined that the one-year prescriptive period began to run on February 22, 1989, the date that the product lines were replaced. The evidence reflects that no further release from those lines occurred after their replacement.
The Sadlers contend that the prescriptive period should not have commenced prior to November of 1992, when the Sadlers allege that they first discovered that their property was not marketable and had not been cleaned up.
This contention is without merit. The allegations contained in the petition indicate that the Sadlers knew of the damage to their property and its cause in February of 1989. The trial court was correct in its determination that the prescriptive period commenced on February 22, 1989, the date the product lines were replaced.
The Sadlers also contend that the trial court erred in determining that continuing remediation efforts and payment for cleanup activities did not represent tacit acknowledgement of liability, which would interrupt prescription continuously through September 30, 1992. Apparently, the Sadlers argue that the cleanup action from February, 1989, until December, 1991, when the equipment was removed, constituted a continuing *1083 acknowledgment of liability which interrupted prescription.
"Prescription that has commenced to accrue, but has not yet run, may be interrupted. `Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe.' La. C.C. art. 3464. `If prescription is interrupted, the time that has run is not counted. Prescription commences to run anew from the last day of interruption.' La. C.C. art. 3466." Lima v. Schmidt, 595 So.2d 624, 631 (La.1992).
In this case, the trial court found that the payment made to CBSI by the LDEQ constituted a tacit acknowledgment. The trial court also found that these three payments were tendered on March 20, 1990, February 14, 1991 and September 28, 1992. Thus, the prescriptive period of one year, which began on February 22, 1989, had already run when the first payment was tendered.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiffs, Frank and Janice Sadler.
AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although this opinion does not address each assignment of error individually, it disposes of all issues.
[3] La. R.S. 30:2194(5) defined "substantial compliance" as follows:

...an owner of an underground storage tank has registered that tank with the department, has timely paid the annual tank fee, has complied with the state and federal laws and regulations applicable to underground storage tanks, and the rules and regulations adopted thereto, and is fully paid into the trust in compliance with the payment schedule set forth by the private legal entity, and shall have met the financial responsibility requirements imposed by R.S. 30:2195.9, and shall have promptly notified the secretary of any third party claim or suit made against him.
An owner for purposes of the Tank Trust Fund is now an "eligible participant" which is defined as "any owner of an underground storage tank that has registered the tank with the department and has met the financial responsibility requirements imposed by R.S. 30:2195.9." La. R.S. 30:2194 B(3).