PETTIGREW, J.
| ?This appeal is by the defendants of a February 20, 2013 judgment granted in favor of the plaintiffs. After a trial on the merits, on claims of redhibition and personal injury, the trial court rescinded the sale of the house located at 407 Avenue H, Kentwood, Louisiana. The rescission was based on a finding that the house contained redhibitory defects (toxic mold) of which the sellers were aware, but failed to inform the buyers. The judgment ordered the sellers to refund the plaintiffs the purchase price of $50,000.00 plus reasonable expenses of $1,875.00 together with judicial interest and all costs, awarded an additional $100,000.00 on a personal injury claim for damages sustained by the wife as a result of the exposure to mold in the home, and awarded the husband $50,000.00 for his own losses as a result of exposure to mold. The defendants also appeal the trial court’s denial of their exception of prescription on March 5, 2007.[1]
*1037 FACTUAL BACKGROUND
On March 31, 2000, plaintiffs, Rebecca and Peter Guillot (the Guillots), purchased from brothers, Rodney Bryan Doughty and Allen Leroy Doughty (defendants), a house, built in approximately 1870, located at 407 Avenue H, Kentwood, Louisiana (on Lots 7, 9, and 11 of Block 21 of the Brooks-Scanlon Addition to the Town of Kentwood), for the price of $50,000.00. (Defendants assert that this was their childhood home, which neither of them had visited in over fifty years, that had been acquired by them from their parents by act of donation.)
In early 2000, the defendants listed the house for sale through local realtors, with an asking price of $60,000.00. The plaintiffs visited the house two or three times before making an offer to purchase. Shortly thereafter, plaintiffs entered into a purchase agreement and hired a home inspector to inspect the home. A building analysis report |,c.dated March 14, 2000, submitted to the plaintiffs by Lannon Realty Services, Inc., revealed that numerous faulty conditions were observed, including the following ones relevant to the issues presented on appeal:[2]
Floor Framing — Rot and damage noted to the finished flooring and floor joists under the front left room, at the back left corner and closet, rot also observed in the flooring and floor joist of the adjacent bathroom. Heavy mold build up under the flooring in these areas.
Crawlspace — The crawlspace was observed to be damp and moldy, additional ventilation is recommended. Previous shoring and repairs also noted.
Plumbing
[[Image here]]
Drain/Waste/Vent Piping — ... The kitchen drain under the house is rusted through and leaking.
Roof
[[Image here]]
The corrugated metal roof over the carport does show signs of active leaks, ... Some rot noted in the sheathing and the joist below. Heavy damage noted to the end of the back beam on the right side.
Summary
[[Image here]]

Damage noted to the floor and floor framing under the back left comer of the front left room, the closet, and adjoining bathroom. Damage appears to be from mold and dampness.

[[Image here]]

Rot noted in the carport sheathing and framing.

(Emphasis in italics added.)
|,(On or about March 31, 2000[3], an Act of Cash Sale was executed between the par *1038 ties, wherein the plaintiffs purchased the house from the defendants for the price of $50,000.00. According to the parties, they negotiated a reduction in price based on the condition of the premises as revealed by the home inspection; namely, $10,000.00 downward from the asking price to $50,000.00, and the sellers agreed to pay $1,500.00 in closing costs.[4]
The Guillots moved into the house, and in early April 2000, Ms. Guillot ripped up the carpet in the living room (a task that took her three days). She noticed that it was filthy underneath and observed a black, gelatinous substance, which she cleaned. Shortly thereafter, Ms. Guillot became sick with an upper respiratory infection, which lasted until July or August 2000. The Guillots’ testimony also revealed that within a short time after moving into the house, Mr. Guillot and their young toddler also began having persistent respiratory problems, for which they all sought treatment from their primary care physician.
However, the prescribed antibiotics did not relieve Ms. Guillot’s persistent cough or respiratory symptoms; in fact, her medical condition deteriorated rapidly, and included symptoms other than the chronic respiratory ones. She began having pain in her hip that radiated down and physically debilitated the left side of her body, oftentimes rendering it numb. She also began having pains in her head and arms, and found it very physically difficult to play with her child. She further developed dermatologic problems including hives and painful itchy rashes that did not go away. Additionally, she developed an itching sensation in her eyes that, she testified, felt as though there was sand in them.
|,fin early 2001 [5], Ms. Guillot sought treatment from an allergist, Dr. Rolston, who performed a scratch test and diagnosed her with an allergy to a specific and very common type of mold — aspergillus— typically found in grass. She was treated for that with Claritin and nasal steroid sprays. However, her symptoms persisted and continued to vary. She continued having aches and pains in her joints, swelling in the lower extremities, puffiness in her face, and fever at night.
The Guillots testified they were very concerned about Ms. Guillot’s rapidly deteriorating health. Throughout the year 2001, they began seeking out the advice and treatment of many specialists, including neurologists and endocrinologists, none of whom were able to definitively diagnose or successfully treat her symptoms. Mr. and Ms. Guillot testified that she was seen by twenty-four different physicians in the course of a year, all unsuccessful in their attempts to get to the root of Ms. Guillot’s illness and render a definitive diagnosis. According to the Guillots, none of these doctors ever mentioned environmental concerns, or specifically, mold, as a cause or concern about her symptoms. Rather, she *1039 was tested for such things as chronic fatigue, fibromyalgia, soft tissue problems, and auto-immune diseases, none of which tested positive.
Ms. Guillot became unable to go to work, and her mother-in-law ended up having to come stay with her at the house, helping her with such basic things as getting out of bed. Ms. Guillot testified that she began to get depressed and nervous, and even sought the help of a counselor. She testified that she ended up going to the emergency room three times for symptoms of feelings of numbness on one side of her body. She found out later that she was actually having panic attacks. During the third of these emergency room visits, Ms. Guillot testified that the emergency room doctor began to really question her about the totality of her persistent symptoms, and specifically questioned about her living situation. Ms. Guillot stated that she told the doctor it was “funny” he should ask her that, because she realized then that she had been perfectly healthy until moving into | (¿he new house. The ER doctor’s nurse, who was privy to the conversation, suggested to Ms. Guillot that she apply to see a well-known environmental expert physician, Dr. Andrew Campbell, at the Center for Immune Environmental & Toxic Disorders in Spring, Texas.
Ms. Guillot immediately applied for, completed, and submitted an extensive questionnaire in November 2001, in order to be accepted as a patient by Dr. Campbell. Shortly thereafter, she was contacted by Dr. Campbell’s office, notifying her that she qualified to be seen as a patient. She went to see Dr. Campbell near the end of 2001, at which time he performed an extensive battery of testing, including taking hair, tongue, spit, blood, and urine samples, performing nerve conduction studies, MRIs, and CT scans. In January 2002, the test results were ready, and she returned for a follow-up visit with Dr. Campbell to obtain those results. At that visit, on January 23, 2002, she was told by Dr. Campbell that she had tested positive for several different toxic molds in her blood stream. Dr. Campbell informed her that as a result of that mold in her system, she had suffered damage to her myelin sheath, which was causing her numbness and pain, for which she received IV infusions that lasted seven hours a day. (Ms. Guillot testified that she underwent fifty-six of these treatments over the course of three years.) She was also prescribed Sporanox for her fungal infections. On that date, Dr. Campbell also urged her to leave the house, together with all of its contents, immediately, which she and her child did. Mr. Guillot stayed in the house for approximately one week, after which time, he too, left the house and all of its contents.[6]
Ms. Guillot further testified that once she got the test results and diagnosis from Dr. Campbell, she contacted the real estate agency through which they had bought the house to see about getting in touch with the sellers, since they had found out there could be environmental problems with the house. However, they never were put in contact [7with the defendants, and they did not follow up. They also hired a mold remediation firm to inspect the house and, promptly, contacted and retained an attorney.
*1040 On March 5, 2002, the inspection report from Guarantee Systems (the mold remediation firm retained by the Guillots, which performed a complete but non-invasive mold inspection on January 28, 2002) revealed significant moisture in the wood floors of the house, rotted wood, and large colonies of toxic mold growth throughout the entire house. Danny Bauers, the inspector for Guarantee Systems, testified that he recommended that the entire house be air tested to determine the extent of the mold infestation. He gave the Guil-lots a proposal for doing that and for cleaning the duct work in the air conditioning system, due to the fact that he had already detected toxic mold in the house and mold spores go airborne. However, he was not hired by the Guillots to do the remediation work.
PROCEDURAL HISTORY
On January 17, 2003, Mr. and Ms. Guil-lot, together and on behalf of their minor son, Connor, filed a petition for damages naming as defendants the Doughty brothers, as sellers, alleging defendants are ha-ble to them in redhibition, for the redhibi-tory defects “discovered in their family home on March 5, 2002[7],” consisting of toxic mold colonies throughout the house. They alleged that the house experienced significant flooding prior to their purchase, during which time the house had been rented, and therefore, the defects were present at the time of the sale. They also alleged the sellers had knowledge that the house had flooded and had knowledge of the mold problem existing in the house, but failed to disclose this fact prior to or at the time of the sale. The Guillots also alleged that they sustained serious health issues as a result of exposure to the toxic mold and asserted the defendants are also liable to them for damages for those personal injuries resulting from said exposure. They also claimed entitlement to damages for the | sloss of consortium suffered by Mr. Guillot and their minor son, Connor, as a result of the more serious personal injuries suffered by Ms. Guillot.
The defendants filed an answer, asserting that the Guillots had knowledge of the condition of the house at the time of sale, including the existence of mold, and therefore, the alleged defects were not redhibi-tory. They asserted that the purchase price of the house was reflective of the condition of the house at the time of sale. They further asserted that, because of the Guillots’ knowledge of said defects at the time of sale, their claims had prescribed. After performing some discovery, the defendants also filed an exception urging the objection of prescription on that same basis — that the Guillots had knowledge at the time of the sale, and in the alternative, at the latest, in July or August 2000, when Ms. Guillot pulled up the carpet and observed additional mold. In any event, they maintained that the Guillots had knowledge of the existence of the mold in the house far more than one year prior to the filing of their suit.
ACTION OF THE TRIAL COURT
The minutes of court contained in the record reveal that the trial court heard the exception of prescription on March 5, 2007, following which the trial court orally denied the exception. The matter proceeded *1041 to a bench trial on October 30, 2012, during which the defendants re-urged their exception of prescription. After the close of plaintiffs’ case, the defendants sought an involuntary dismissal, which was denied by the trial court. In refusing to grant the involuntary dismissal, the trial court stated that it believed the plaintiffs bore their burden of proof that the sellers had knowledge that the house had “flooded” due to there having been a leak that resulted in the entire house having to be re-plumbed, prior to the sale to the plaintiffs. The trial court also again denied the exception of prescription, stating that it considered the exposure to mold was a “continuing tort,” which did not end until the Guillots moved out of the house in January 2002. By judgment signed February 20, 2013, the trial court ruled in favor of the plaintiffs and against the defendants, rescinding the sale of the house, ordering the defendants to refund to the Guillots the purchase price of $50,000.00, together with reasonable expenses of $1,875.00, with judicial interest and costs. The judgment further 19awarded Ms. Guillot the sum of $100,000.00, and Mr. Guillot the sum of $50,000.00, for the personal injuries they each sustained as a result of exposure to mold in the house, with judicial interest from the date of demand until paid.
This appeal by the defendants followed.
ASSIGNMENTS OF ERROR
Defendants urge the trial court erred in the following respects:
1. The trial court incorrectly denied the exception of prescription.
2. The trial court incorrectly denied the involuntary dismissal.
3. The trial court incorrectly applied the continuing tort doctrine.
4. The trial court incorrectly held flooding occurred in the house based upon hearsay.
5. The trial court incorrectly sustained an objection to the introduction of the Lannon Realty report as being hearsay.
6. The judge’s decision was incorrect and rescission of the sale is precluded by law.
For the ease of discussion and analysis, all necessary assignments of error are addressed, though not necessarily in the order or manner presented,
DISCUSSION AND ANALYSIS
STANDARD OF REVIEW
Redhibition
The defectiveness of the thing sold is a factual determination by the trier of fact, whose factual conclusions will not be disturbed on appeal absent manifest error Arceneaux v. Domingue, 365 So.2d 1330, 1333-34 (La.1978).
Prescription
Generally, the trial court’s factual findings on a peremptory exception raising the objection of prescription, such as the date on which prescription begins to run, are reviewed on appeal under the manifest error-clearly wrong standard of review, Gilmore v. Whited, 2008-1808 (La.App. 1 Cir. 3/31/09), 9 So.3d 296, 299.
Thus, the applicable standard of review on all Issues presented herein is manifest error.
|inTHE LANNON REALTY INSPECTION REPORT
During the trial, in cross-examination of the plaintiffs, the plaintiffs objected to the introduction into evidence of the inspection report done prior to the sale of the house by Lannon Realty, presented to the. Guil-lots in March 2000, The basis for their *1042 objection was that the inspector was not being called as a witness, rendering the report as inadmissible hearsay. The defendants asserted that the report was not hearsay, because it was not being offered for the truth of the matters asserted therein or as a factual basis for the condition of the house as reflected therein, but for the limited purpose of revealing the Guillots’ knowledge and awareness of the contents therein. (Plaintiffs’ appellee brief does not address this assignment of error.)
Louisiana Code of Evidence Article 801(C) defines hearsay as “a statement, other than one made by the declarant while testifying ... offered In evidence to prove the truth of the matter asserted.” (Emphasis added.) The official comments to Art. 801(C) provide that this paragraph makes clear that a non-assertive use, i.e., to prove anything other than the truth of the out-of-court statement, is not hearsay. (Emphasis added.)
We find that the inspection report in this matter, and the use for which it was offered, is simply not hearsay. A very critical fact to both the defendants’ exception of prescription and to the plaintiffs’ cause of action in redhibition is the knowledge that the Guillots had, or should have had, about the possibility that the house they bought had a mold problem that could constitute a redhibitory defect. The actual date of that knowledge is a crucial element in the realm of prescription; and, as argued by the defendants, the report was being used to question the Guillots regarding their knowledge of the contents therein, as well as being submitted as proof, that as of the date of the report, the Guillots knew what the report said. The report was not being offered as factual evidence of the condition of the house at the time of the inspection. (Indeed, we note, that the presence of mold in the house is not one of the facts being contested herein; rather, at issue is when the Guillots knew or should have known that there may be a mold issue with the house.)
|n Therefore, we find the trial court erred as a matter of law in sustaining the plaintiffs’ objection to the introduction into evidence of that report on the basis of hearsay. We reverse that ruling, and accordingly, have included the proffered report in our review of the record and in our analysis of the issues presented herein,
BURDEN OF PROOF
Prescription
This court recently restated the burden of proof as to prescription in the context of a redhibition action in Rebstock v. Seismic Exchange Inc., 2013 WL 5915140, at *1 (La.App. 1 Cir. ll/l/2013)(unpublished), as follows:
Generally, the burden of proving an action is prescribed lies with the party pleading prescription. Hogg v. Chevron USA, Inc., 09-2632 (La.7/6/10), 45 So.3d 991, 998. An exception to this general rule exists when the face of the petition shows that it is prescribed, in which case the burden shifts to the plaintiff to prove that prescription was interrupted or suspended. Bailey v. Khoury, 040620 (La.1/20/05), 891 So.2d 1268,1275. Stated another way, it is only when the plaintiffs claim is prescribed on the face of the petition that the initial burden of proof is shifted, to the plaintiff to prove that the claim is not prescribed. The party urging the application of an exception to the general rule on prescription has the burden of proving that the exception applies. Cf. Rota, Inc. v. Courtney, 09-0508 (La.App. 1 Cir. 8/10/10), 47 So.3d 500, 506. Consequently, the burden of proof does not shift to the plaintiff unless the defendant can establish that the face of the plaintiffs petition reveals that the plaintiff knew or should *1043 have known of the damage more than one year before the petition was filed. Sadler v. Midboe, 97-2120 (La.App. 1 Cir. 12/28/98), 723 So.2d 1076,1082.
Redhibition
In Rey v. Cuccia, 298 So.2d 840 (La.1974) (statutorily overruled on other grounds[8]), the Louisiana Supreme Court discussed the burden of proof in a redhibition action as follows:
A redhibitory defect entitling the buyer to annul the sale is some defect in the manufacture or design of a thing sold ‘which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.’ Article 2520. Upon proof of such a defect, the buyer is Identified to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects.
[[Image here]]
The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale. As stated in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155: ‘[P]roof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows the fact or causation sought to be proved is more probable than not.’
Id. at 842-843 (citations omitted).
APPLICABLE LAW
Redhibition
The seller warrants the buyer against redhibitory defects (vices) in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. La. C.C. art. 2520. However, the seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer or such things. La. C.C. art. 2521. Comment (b) to article 2521 further explains that a defect is not redhibitory when the buyer knows of it either because it was disclosed by the seller or because the buyer discovered it by himself. Finally, the buyer must give the seller notice of the existence of a redhibitory defect in the thing sold, which must be sufficiently timely as to allow the seller the opportunity to make the required repairs. A buyer who fails to give that notice suffers diminution of the warranty to the extent the seller can show that the defect could have been repaired or that repairs would have been less burdensome, had he received timely notice. La. C.C. art. 2522.
Prescription and Redhibition
An action against a seller who did not know of the existence of the defect in the thing sold prescribes in four years from the day delivery of such thing was made to the 113buyer or one year from the day the defect was discovered by the buyer, whichever occurs first. La. C.C. art. 2534(A)(1). However, subsection (A)(2), specifically applicable to a defect in residential or commercial immovable property, provides that an action in redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery was made to *1044 the buyer. Thus, in general, a redhibitory action regarding residential or commercial property prescribes one year from the date of the sale, unless the seller had knowledge of the vice and neglected or failed to declare it to the buyer. Insurance Storage Pool, Inc. v. Parish National Bank, 97-2757 (La.App. 1 Cir. 5/14/99), 732 So.2d 815, 819.
An action against a seller who knew or is presumed to have known of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer. La. C.C. art. 2534(B).
On a trial of the exception of prescription to an action in redhibition, the issue is whether a year passed between the sale and the filing of the action, and if a year had so passed, whether the seller knew of the alleged vice and failed to disclose that fact to the buyer, in which case, an added issue is whether the buyer filed suit within a year following his discovery of the alleged vice. Insurance Storage Pool, Inc., 732 So.2d at 820. The party pleading prescription has the burden of proof. However, when the face of the petition indicates that prescription has tolled, the buyer bears the burden of showing the claim has not prescribed and, in this respect, if it is alleged that the seller had knowledge of the defect and failed to disclose, the buyer must prove same before the rule of La. C.C. 2534(B) applies. See Id. (Emphasis added.)
APPLICATION OF LAW AND ANALYSIS
The Guillots’ petition, filed more than one year from the date of the Act of Sale is prescribed on its face. Therefore, they had the burden of proving that their claims had not prescribed. Moreover, the Guillots have also alleged that the sellers had knowledge of the defects and failed to disclose same to them prior to the sale. Therefore, as noted by the jurisprudence cited above, the Guillots also bear the burden of proving that the defendants had knowledge of the defects (were in bad faith) in order to benefit from the [ udate of discovery provision of La. C.C. art. 2534(B). If they do not bear their burden of proof of bad faith on the part of the sellers, the prescription of their claim in redhibition is governed by La. C.C. 2534(A)(2), i.e., one year from the date delivery of the property was made to the.
The plaintiffs called one of the defendants, Allen Doughty, as a witness. He testified that he and his brother became co-owners of the house by an act of donation, but that neither of them had lived in the house since 1956. He lives in Shreveport, Louisiana, and for several years prior to selling, the house, it was rented out to various individuals. He testified that he signed the disclosure statement that accompanied the sale of the house in which he stated that, to his knowledge, the house had never flooded or had any other type of water damage. He reiterated that lack of knowledge during his trial testimony. Further, he maintained that the first knowledge he had that there was any mold in the house was at the same time and from the same source — the Lannon Realty inspection report — that the Guillots acquired the same knowledge.
The plaintiffs also introduced into evidence the deposition of William Bobby Gill, the Mayor of Kentwood at the time relevant to the issues presented herein, but who was deceased at the time of trial. Contrary to the Guillots’ arguments and the trial court’s findings, our review of this testimony reveals that it does not constitute proof that the house flooded prior to the sale, and even less so, that the sellers knew of that purported house flooding and failed to disclose it. Moreover, as a mat *1045 ter of law, we note that Mr. Gill’s testimony consists largely of inadmissible hearsay from prior renters and neighbors, none of whom were called to testify. (Notably, the testimony of Mr. Gill established that the person renting the house at the time of the alleged flooding of the house, Connie Adams, and the plumber who re-plumbed the house, Frank Cutrer, still live in Kent-wood and could easily be located.)
Mr. Gill testified that he knew the Guil-lots from when they lived in the house and that he was familiar with the history of the house. He was aware that Allen and Rodney Doughty owned the house, but rented it to several renters over the years. Mr. Gill also testified about an incident when he was apprised that there was a large amount of water |lr,leaking from a pipe underneath the Doughtys’ house. In fact, it was such a large amount, that after inspecting it, he had the water cut off in the town, and had the town handyman come repair it. He testified that after-wards, the house was re-plumbed. However, Mr. Gill also testified that he did not know whether mere was actually, any flooding inside of the house and that he never went inside of the house at the time of or anytime after the leak. Mr. Gill also testified that he had never seen either of the Doughty brothers at the house in the many years since they had moved away.
The plaintiffs relied on the above evidence, which they argue on appeal was sufficient to support the trial court’s finding that the sellers knew or should have known that the house contained mold, and failed to disclose it to them. We recognize that ruling was based on factual findings, subject to the manifest error review. However, we find such error, because the foregoing evidence fails woefully short of establishing the knowledge requisite to entitle the Guillots to the longer prescriptive period provided in La. C.C. art. 2534(B). The circumstantial evidence merely proves that there was a leak at the house where an inordinate amount of water poured outside, underneath, and around the house. There is no evidence that there was ever any water inside of the house, or that the sellers knew that there was any water inside the house. It also appears that the witnesses possessing this critical knowledge were available and accessible, but they were not called.[9]
Having found that the trial court manifestly erred and that the Guillots failed in their burden of proving the sellers were in bad faith (because they knew or should have known that the house contained mold at the time of safe), the plaintiffs’ claim in redhibition is governed by La. C.C. art. 2534(A)(2), and their redhibition action, filed more 11fithan one year from the date delivery of the house was made to them, is .prescribed. Accordingly, the judgment of the trial court awarding them rescission of the sale, return of the purchase price, and reasonable costs must be reversed.
Prescription for Personal Injury Action
Delictual actions are subject to a liberative prescription of one year, which *1046 begins to run from the day injury or damage is sustained. La. C.C. art. 3492. Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502, 510; Barber v. Employers Ins. Co. of Wausau, 2013 WL 2393091 (La.App. 1 Cir. 5/31/13)(unpublished). When the claimant is unaware of the facts giving rise to his or her cause of action against a particular defendant, the running of prescription is for that reason suspended until the tort victim discovers or should have discovered the facts upon which his or her cause of action is based Doe v. Delta Women’s Clinic of Baton Rouge, 09-1776 (La.App. 1 Cir. 4/30/10), 37 So.3d 1076, 1080, writ denied, 10-1238 (La.9/17/10), 45 So.3d 1055.
As noted earlier, in their original petition, the Guillots alleged they had knowledge of the personal injury caused by toxic mold in the house on March 5, 2002, when they received the report from Guarantee. Systems confirming the. existence of toxic mold throughout the house. However, during litigation, the focus of their argument is that they had such knowledge when Ms. Guillot was diagnosed by Dr. Campbell with health conditions directly related to exposure to toxic mold in January 2002.
As noted earlier, the standard of review is manifest error. The trial court’s ruling and award of damages for personal injuries can only be reversed if we find from the record that a reasonable factual basis does not exist for the findings of the trial court and that the record establishes that the trial court was clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). After our thorough review of this entire record, we find no reasonable factual basis for the trial court’s finding that the Guillots did not have actual or constructive knowledge that Ms. Guillot’s medical condition was related to exposure to toxic mold until Dr. Campbell’s diagnosis in January 2002. The record is replete with numerous other instances in which a reasonable trier of fact could have found they had constructive knowledge; i.e., they should have known that their damages were the result of exposure to toxic mold, or at the very least, incite their attention to do further investigation, either of which would start the tolling of prescription.
As early as April 2000, the plaintiffs admit that while pulling up the carpet, Ms. Guillot observed a black sticky substance that appeared to be freshly wet. By all accounts, not only Ms. Guillot, but also Mr. Guillot and Connor, began experiencing persistent respiratory problems. Also, by all accounts, all three of them were extremely healthy prior to moving into the house, and all three of them became sick almost immediately following moving into the house. Even if we believe, as alleged, that Ms. Guillot did not know until later that the substance was actually mold, this discovery, together with the Lannon Realty inspection report identifying the existence of mold in other places, and the Guillots’ health decline immediately thereafter, should have incited the Guillots’ attention that they may be suffering from exposure to mold, directing them to do further investigation at that time.
Moreover, in early 2001, Ms. Guillot sought treatment from allergist, Dr. Rol-ston, who diagnosed her with an allergy to a particular kind of mold. While that mold was not a toxic type of mold, the medi *1047 cation provided to treat it did not relieve Ms. Guillot’s symptoms. Additionally, she had knowledge from the Lannon Realty inspection report that there was other mold in the house, together with this diagnosis of having a problem with a certain type of mold. Indeed, in an interview given for a newspaper article (introduced in redacted form into evidence), Ms. Guil-lot stated that her visit to and diagnosis by Dr. Rolston in early 2001 “was my first clue that my home was the source of the problem.” (Emphasis added.)
hsThe record also contains Ms. Guillots trial testimony, that when the emergency room doctor’s nurse advised her that she should go see Dr. Campbell for his expertise in environmental toxic mold, it was the first time she was apprised that there may be an “environmental” issue involved with her declining health. Moreover, in an affidavit submitted by Ms. Guillot as an attachment to plaintiffs’ opposition to the exception of prescription, Ms. Guillot attests that in September 2001, she “was admitted to the St. Clare unit for depression and anxiety, and while [she] was there, a nurse advised [her] that [she] should seek evaluation for possible mold infestation.”
Finally, the record contains the questionnaire completed by Ms. Guillot in November 2001, as part of applying to be seen as a patient by Dr. Campbell. The very act of filling out the questionnaire in November 2001, as part of an application to be seen by a toxic mold specialist, is evidence in itself that Ms. Guillot had sufficient knowledge (or should have known) that exposure to the mold in the house was at the root of her declining health. Moreover, in response to a question regarding possible contact with hazardous and toxic agents, including mold, asking for details of said contact or exposure, Ms. Guillot responded, in part, that she “pulled up carpet in our living room in April 2000 that had a black moldy substance on the underside and all over the floor.” In that same questionnaire she represented that since August 2001, she could smell and taste mold. In response to the question: “Have you ever changed your residence because of a health problem? If so why, when?,” Ms. Guillot wrote: “1997 — Mold in duplex — bathroom & grew everywhere” This is contrary to all of the Guillots’ contentions throughout this litigation that they had no idea that there were such type molds that were toxic and harmful to one’s health until they saw Dr. Campbell. (At trial, Ms. Guillot admitted that in that duplex, there was mildew in the bathroom. However, she denied that she moved from the duplex for that reason; rather, she stated she moved because she had become engaged to Mr. Guillot. Yet, she was unable to explain making that representation in the questionnaire.)
We find any one of the above described events sufficient to establish a time when the Guillots knew or should have known sufficient facts on which their cause of 119action for exposure to mold in the house is based. Every one of these events occurred more than one year prior to the filing of their petition in January 2003. Accordingly, the trial court was clearly wrong in denying the exception of prescription as to the personal injury claim as well, and we are therefore constrained to reverse that portion of the judgment as well.
CONCLUSION
For the foregoing reasons, we find the trial court manifestly erred in denying the defendants’ exception of prescription. Giving the plaintiffs every benefit of the doubt, at the very latest, prescription began tolling in November 2001, and their petition, filed on January 17, 2003, had *1048 prescribed. Accordingly, the judgment of the trial court is reversed in its entirety. The exception of prescription is’ hereby granted, and the plaintiffs’ claims dismissed. Costs of this appeal are assessed to the plaintiffs, Mr. and Ms. Guillot.
REVERSED AND RENDERED.
McCLENDON, J., concurs with Result reached by the majority.

. The ruling denying the exception of prescription is an interlocutory ruling that is not appealable. There is no judgment in the record before us denying the exception; however, the minutes of court show a March 5, 2007 entry, indicating a hearing was held, *1037 evidence was introduced, arguments were presented, and the trial court denied the exception. When an unrestricted appeal is taken from a final judgment, the appellants are entitled to seek review of all adverse interlocutory judgments prejudicial to them, in addition to the review of the final judgment. Price v. Kids World, 2008-1815, p. 3 (La.App. 1 Cir. 3/27/09), 9 So.3d 992, 994.

. The report was proffered into the record after the trial court sustained an objection on the basis of hearsay. The trial court’s ruling, sustaining the objection is one of the assignments of error in this appeal. As later discussed in this opinion, we agree with the appellant, and find the trial court erred in sustaining the objection; for the reasons provided later herein, defendants should have been allowed to introduce it into evidence. Therefore, we have included it in our review of the record and our analysis of the issues presented.

. Plaintiffs’ petition asserts they purchased the house on March 31, 2000. However, the Act of Cash Sale contained in the record reveals that defendants appeared through no *1038 tarized signatures; by Rodney Bryan Doughty, who resides in Roanoke, Va., on March 31, 2000, by Allen Leroy Doughty, who resides in Shreveport, La., on March 30, 2000, and Peter and Rebecca Guillot appeared physically on April 4, 2000.

. Both Mr. and Ms. Guillot testified that the reduction in the purchase price was based on the inclusion in the inspection report about the condition of the roof, and their concerns of purchasing a house where the roof may fall in. They both insisted that they were not concerned at all about the report’s inclusion of rotting and mold, believing that if they cleaned and ventilated, as suggested by the inspector, that concern would be remedied and resolved.

. The record does not establish the exact date(s) cf Ms. Guillot’s treatment with Dr. Rolston, however, the parties do not dispute that it was sometime in early 2001.

. The Guillots testified that they first lived with Ms. Guillot's sister for approximately eleven months. Then, through a local church, they were offered a stay at a deaf center for another three months; following which they lived at her in-laws' camp in Vacherie, .La., from May 2003 until December 2005, at which time, the family moved to New Mexico, with a milder, drier climate that Dr. Campbell medically recommended for Ms. Guillot.

. Throughout this litigation, the plaintiffs maintain that they did not know of the existence of harmful mold in the house, nor that it was the cause of their health issues until Dr. Campbell diagnosed Ms. Guillot with health conditions caused by her exposure to toxic mold in January 2002. The date used in the petition, however, is the March 5, 2002 date of the Guarantee Systems inspection report confirming that the entire house contained toxic mold.

. See 1993 La.Sess. Law Serv. Act 841.

. We note that the plaintiffs sought to call as a witness Mr. Benny Costello, a former neighbor, in an effort to establish that the sellers had knowledge, prior to the sale, that the house at issue had water damage and mold. However, the defendants objected on the basis that Mr. Costello was not listed as a witness in the pretrial order. The trial court agreed, and disallowed any direct testimony by this witness. The plaintiffs were given the opportunity and proffered the testimony. Although the plaintiffs’ proffer is contained in the record, there has been no answer filed or any objection raised an appeal otherwise regarding the disallowing of this witness. Moreover, we note that the trial court has vast discretion in allowing or disallowing testimony of witnesses based on the failure to comply with the court’s schedule and deadlines, and we find no error herein.